## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **MICHAEL J. COOPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 15-cv-3260** |
| | ) | |
| **CAROLYN COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Plaintiff Michael J. Cooper appeals from the denial of his application for Social Security Disability Insurance benefits and Supplemental Security Income Disability benefits under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Plaintiff has filed a Motion for Summary Judgment (d/e 11) and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 15).  For the reasons set forth below, the Decision of the Commissioner is REVERSED and REMANDED for further proceedings.

## I. BACKGROUND

Plaintiff was born January 31, 1962.  Plaintiff graduated high school and has worked in the past as a laborer/construction worker, auto glass installation specialist, and auto glass installation manager.  See R. 229; R. 82 (correcting listing of iron worker to construction worker II).  Plaintiff testified that he last worked as a glass installation specialist in 2010 when he was laid off because he was no longer able to install glass. R. 53.

Plaintiff's medical history is set forth in Plaintiff's brief and the Administrative Law Judge's (ALJ) opinion.  The Court provides a brief summary here to put Plaintiff's claims in context.

Plaintiff was a patient of Dr. S. David Ross for many years. During that time, Dr. Ross diagnosed Plaintiff with numerous conditions and prescribed multiple medications, including steroids. At the hearing, Plaintiff testified that Dr. Ross misdiagnosed him, had him on the wrong medications, and "almost killed" him.  R 65.

In approximately the fall of 2012, Plaintiff stopped seeing Dr. Ross and, upon further testing by other physicians, several of Dr. Ross's diagnoses were ruled out or resolved when Plaintiff stopped taking the steroids.  See R. 65; R. 1116 (December 19, 2013

medical record of Dr. Lynn Speck indicating Plaintiff's "diabetes due to glucocorticoids appears to have resolved" and that he "no longer has adrenal insufficiency").  The record suggests that the steroids prescribed to Plaintiff contributed to the epidural lipomatosis on Plaintiff's thoracic spine.  R. 65; R. 867 (May 16, 2013 medical record of Dr. Lewis noting that Plaintiff's spinal epidural lipomatosis "was an unusual complication of prolonged steroid therapy"); see also https://www.cedars-sinai.edu/Patients/Health-Conditions/Epidural-Lipomatosis.aspx (last visited November 30, 2016) (providing that "[e]pidural lipomatosis is a rare disorder in which an abnormal amount of fat is deposited on or outside the lining of the spine"; common symptoms include back pain and weakness; also noting that patients who use steroids for many years are more likely to get epidural lipomatosis).

The medical record shows that, by late 2012 and thereafter, Plaintiff generally complained of the following conditions/symptoms: hypogammaglobulinemia (a/k/a common variable immunodeficiency), back pain, gastrointestinal issues, headaches, hand tremors, fatigue, anxiety, depression, sleep apnea,

and shoulder pain.  He was also diagnosed with neuropathy.  R. 787-89 (electromyography conducted April 2013).

On November 18, 2012, Plaintiff applied for Disability Insurance benefits.  On June 14, 2012, Plaintiff applied for Supplemental Security Income Disability benefits.  In both applications, Plaintiff alleged disability beginning January 1, 2011.

## II. THE HEARING

On January 28, 2014, the ALJ held a hearing.  Plaintiff testified that the problems that kept him from working include his back pain, Crohn's disease, migraines, his "immune situation" (the hypogammaglobulinemia), tremors in his hands, fatigue, and depression.  R. 58-60.  Plaintiff testified he suffered side effects from his medication, including the Imitrex for migraines, which put him to sleep.  R. 59.

Plaintiff testified he has seven or eight migraines a month.  R. 68.  The migraines make him sick (vomiting) and he takes the Imitrex, which puts him to sleep.  R. 59, 68.  It takes about 30 minutes for the medication to kick in and then he sleeps for three to four hours.  R. 68.  In some cases, Plaintiff has to go to the hospital or Prompt Care for an injection of Dilaudid for the migraines. R. 69.

Plaintiff also testified that he currently undergoes infusion treatments for his hypogammaglobulinemia at the hospital every two weeks, which takes eight hours and cannot be done on the weekends.  R. 69.  Plaintiff testified the infusions started approximately four years earlier, while he was still working.  R. 81.  In the past, he underwent the infusions every three weeks but that was not working.  R. 69.

Plaintiff sees a psychiatrist once a month and a therapist every three or four weeks, sometimes more frequently.  R. 60, 70.  He sees Dr. Ferdinand Salvacion from the pain clinic for his back pain.  R. 71.  Plaintiff has been told by a surgeon that surgery is not an option for his back pain.  Id.  Plaintiff takes morphine and Norco for his back pain and uses ice and heat on his back.  R. 70-71.  Plaintiff also testified that he has trouble with his memory and concentration.  R. 74.

The ALJ asked the vocational expert to consider an individual age 47 to 51 years, high school education, with past work of a construction worker II, glass installer, and glass installation supervisor.  R. 82.  The individual could perform light and sedentary work but not jobs that would require climbing ladders,

rope, scaffolds, or work at unprotected heights.  R. 82.  The jobs cannot require more than occasional over-the-shoulder work and no work with a concentrated exposure to respiratory irritants, including temperature extremes.  The jobs must also be limited to those that do not require complex or detailed tasks.  R. 83.

The vocational expert testified that past work would be ruled out.  R. 83.  The vocational expert also testified, however, that unskilled, entry level work would be available for an individual with those limitations, including mailer sorter (3,700 persons doing that work  in Illinois), office helper (4,700 persons doing that work in Illinois), document preparer/microfilming (about 2,800 jobs in Illinois), and final assembler (1,700 persons doing that work in Illinois).  R. 83.

Plaintiff's attorney asked the vocational expert if the jobs would accommodate a person who needed to take a break every two hours for 15 or 20 minutes.  R. 86.  The vocational expert testified that breaks are usually 10 minutes and that it was possible that the breaks Plaintiff's attorney described "would not allow for sustaining work."  R. 86.  The vocational expert also testified that a person could not sustain competitive employment in the community

if he missed work more than twice per month.  R. 86-87.  The jobs identified by the vocational expert required productivity in the range of 90 to 95% to sustain employment.  R. 87.

### III. THE DECISION OF THE ALJ

On March 26, 2014, the ALJ issued her decision.  R. 19-40. The ALJ followed the five-step analysis (the Analysis) set forth in the Social Security Administration (SSA) Regulations.  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and residual functional capacity.  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. § 404.1560(c), 20 C.F.R. § 404.960(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

In this case, the ALJ found that Plaintiff met his burden at Steps 1 and 2.  Plaintiff had not engaged in substantial gainful activity since January 1, 2011, and he had the severe impairments of: degenerative disc disease, degenerative joint disease/rotator cuff dysfunction (right shoulder), sleep problems, migraines,

neuropathy, tremors, depression, and anxiety. R. 21.  The ALJ found that Plaintiff's other impairments were not severe.  For instance, as is relevant to the issues raised on appeal, the ALJ found that Plaintiff suffered from hypogammaglobulinemia, for which Plaintiff received infusions.  The ALJ found that the medical record did not reflect more than minimal functional limitations from the condition.  R. 23.  The ALJ noted that Plaintiff testified that he received the infusions since 2009, and Plaintiff worked at substantial gainful activity in 2010.  The ALJ found that the fact that Plaintiff's infusions did not prevent work in 2010 suggested that the condition would not affect his current ability to work.  The ALJ also rejected Plaintiff's contention that he suffered physical difficulties secondary to the infusions themselves because he twice reported to his doctor having had no problems with the infusions. R. 23.

At Step 3, the ALJ found that none of Plaintiff's impairments or combination of impairments met or medically equaled the severity of a Listing.  R. 23.  The ALJ found that Plaintiff had the residual functional capacity to perform light work with certain limitations:

> [B]ecause of all of his symptoms combined (including from sleep problems, pain, neuropathy, tremors) and possible medication side effects, he should not climb ladders, ropes, or scaffolds or work at unprotected heights; because of his degenerative joint disease and rotator cuff injury, he should not perform more than occasional (as occasional is defined by DOT) over the shoulder work; because of possible pain exacerbation including migraine pain, and his non[-]severe respiratory ailments, the claimant should not work in concentrated exposure to respiratory irritants including temperature extremes; and because of all his mental symptoms combined he may at times of symptom exacerbation have moderate limitations in concentration, persistence[,] or pace when attempting complex or detailed tasks and is therefore limited to jobs that do not require complex or detailed tasks. The claimant has not presented credible evidence that he has greater or different work related limitations.

R. 26.

In explaining the residual functional capacity finding, the ALJ summarized Plaintiff's testimony regarding his impairments. The ALJ also summarized the medical evidence in the record. The ALJ noted Plaintiff's testimony that he received infusions over eight hours every two weeks. R. 27. The ALJ cited to medical records wherein Plaintiff reported getting two headaches a month (March 2013 records), increased migraines in September 2013, and no migraines some weeks. R. 36. The ALJ noted that Plaintiff reporting having migraines since age 15, and Plaintiff worked at

substantial gainful activity for many years since he was 15.  The ALJ found that the fact that Plaintiff's migraines did not prevent work at that time, and with no significant medical evidence that they have worsened since engaging in substantial gainful activity, strongly suggested that the migraines would not prevent current work.  R. 36.

The ALJ found that Plaintiff's allegations of complete and total disability were not credible.[1]  R. 34.  The ALJ stated that Plaintiff's claims of extremely limited functional capacity from pain and tremors was not demonstrated by the medical records, which did not show a significantly limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensation loss, difficulty ambulating, or reflex abnormalities which can be associated with intense and disabling pain.  R. 34, 35 (noting that treatment records show subjective complaints of pain but few objective findings).

At Step 4, the ALJ found that Plaintiff could not perform any past relevant work based on the vocational testimony that the

---

[1] The ALJ's decision preceded SSR 16-3p, which eliminated the use of the term "credibility."

exertional and nonexertional requirements of those jobs exceeded what Plaintiff is currently capable of performing.  R. 38.

At Step 5, the ALJ found that Plaintiff could perform a significant number of jobs in the national economy.  The ALJ relied on the vocational expert's testimony that an individual with Plaintiff's age, education, work experience, and residual functional capacity could perform the representative occupations of mail sorter/clerk, office helper, document preparer/ microfilming, and final assembler.  R. 39.  The ALJ concluded that Plaintiff was not disabled.

The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Plaintiff then brought this action for judicial review.

### IV. STANDARD OF REVIEW

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence

and may not substitute its judgment.  <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th  Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

## V. ANALYSIS

Plaintiff first argues that the ALJ erred by finding that Plaintiff could sustain work on a regular, continuing basis.  Plaintiff asserts that the ability to sustain work on a regular, continuing basis is relevant and material to a finding that a person can work.  According to Plaintiff, the ALJ erred by failing to discuss sustainability of work, despite evidence in the record that Plaintiff underwent eight-hour infusion therapy every two weeks, suffered from recurrent migraines, and had frequent physician interventions for his other medical conditions.

Defendant argues that the ALJ found that Plaintiff received infusions for at least one year while working.  Defendant also cites to other evidence to purportedly show that Plaintiff could sustain full-time work even with the infusion treatments.  Defendant also argues that the ALJ questioned Plaintiff's credibility and that Plaintiff's own "say-so" about his need for treatment is insufficient to show that the medical appointments would preclude full-time work.

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  If a claimant's severe impairment does not meet or medically equal a listing in appendix 1, the ALJ assesses the claimant's residual functional capacity.  Id.  A claimant's residual functional capacity is the most he can do despite his limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a).  When the ALJ assesses a claimant's residual functional capacity, all of the claimant's medically determinable impairments, including those that are not severe, are

considered.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).  In addition, the ALJ must discuss a claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)."  SSR 96-8p.

In this case, the ALJ's decision lacks any meaningful discussion about how Plaintiff's impairments impacted Plaintiff's ability to sustain full-time work.  Specifically, the ALJ did not discuss Petitioner's ability to perform sustained work activities on a regular and continuing basis despite evidence in the record that Plaintiff would miss two days a month for his infusions, two days a month due to migraines or the side-effects from the medication for migraines, and may miss some amount of work due to his multiple medical appointments, many of which, despite Defendant's arguments, appear necessary to monitor and control Plaintiff's various conditions.  While the ALJ questioned Plaintiff's credibility, the ALJ did not find that the infusions were not necessary and did not specifically address Plaintiff's testimony that the medication for the migraines caused him to sleep for several hours.

In addition, the ALJ did not address Plaintiff's testimony that the infusions could not be scheduled on the weekends, stating instead that there was no indication that he could not arrange his treatment to sustain full-time work.  R. 32.  Further, although Plaintiff underwent infusions in 2010 while he was still employed, it is not clear how often he had infusions in 2010, and the infusions may not have been as frequent at that time.  See, e.g., Tr. 69 (Plaintiff's testimony that for a while he received infusions every three weeks but that was not working); R. 710 (Dr. Renu Govindaiah medical note dated October 4, 2012 recommending infusions every three to four weeks); R. 743 (Dr. Govindaiah medical note dated August 8, 2012 noting that Plaintiff did not previously receive infusions on a set schedule).

The ALJ recognized that Plaintiff at times suffered from two migraine headaches per month.  R. 36.  The ALJ noted that Plaintiff reported having the migraines since age 15 but apparently the migraines did not prevent him from working previously.  The ALJ concluded that, with no significant medical evidence that they have worsened, Plaintiff's ability to work in the past strongly suggest they would not prevent current work.  R. 36.  The ALJ did not, however

address whether Plaintiff was likely to miss up to two days of work
per month which, along with missing two days for his infusions,
would not permit him to sustain full-time employment.  R. 87
(finding a person could not sustain competitive employment if he
missed more work than twice per month).  In addition, the ALJ did
not address the sheer number of Plaintiff's other medical
appointments for managing his depression,
hypogammaglobulinemia, and back pain.  Plaintiff also testified that
there has not been a week in the last two years that he has not had
at least one doctor's visit, and more like three, and the
appointments are made by the doctors and not Plaintiff.  R. 66.  The
ALJ did not address the impact of multiple doctors' appointments
on Plaintiff's ability to sustain full-time work.

The Court notes that the sheer number of medical
appointments a claimant attends may be insufficient on its own to
demonstrate disability.  See, e.g., Hoppa v. Colvin, No. 12-cv-847-
bbc, 2013 WL 5874639, at * 5 (W.D. Wis. Oct. 31, 2013)  (noting
that "[if] the 'sheer number of medical visits' were sufficient on its
own, claimants could manufacture their own disabilities simply by
going to the doctor as often as possible for any or no reason.").

However, in this case, there is evidence in the record that Plaintiff's impairments would cause him to miss work and evidence that this is not a case of a claimant who frequently visited a physician to boost his disability claim. There is evidence to the contrary, too, which is why it is important that the ALJ discuss the evidence and her reasoning.

In sum, the ALJ erred by failing to consider whether, in view of the extent and nature of Plaintiff's medical treatment, Plaintiff could sustain work on a regular, continuing basis.  The ALJ discussed some of the evidence in isolation but did not consider the cumulative effect of Plaintiff's medical treatment on his ability to sustain full-time work.  The Court does not suggest that the ALJ was required to find that Plaintiff's medical treatment would impact his ability to sustain full-time work.  However, the complete lack of an explanation on the issue requires remand.  See Moore v. Colvin, 743 F.3d 1118, 1127 (7th Cir. 2014) (noting that the ALJ should have included in the residual functional capacity determination the likelihood of the plaintiff's missing work and that the ALJ's decision did not reflect any likelihood of absences or breaks at work related to migraines); Gossage v. Colvin, No. 14-cv-1231-JPG-CJP,  2016

WL 2733331, at * 7 (S.D. Ill. May 11, 2016) (finding the ALJ "erred in failing to consider whether, in view of the extent and nature of her medical treatment, plaintiff was able to sustain competitive employment during the period at issue"); Conley v. Colvin, No. 15-722-RGA-MPT, 2016 WL 3436435, at *11 (D. Del. June 20, 2016); (finding the ALJ did not adequately discuss reasons for ignoring the plaintiff's contention about being disabled due to numerous surgeries and doctors' appointments where plaintiff testimony was neither refuted nor addressed by the ALJ or the defendant).

The cases cited by Defendant are distinguishable because, in those cases, the record lacked evidence to support a finding that the claimant would have numerous absences from work.  See, e.g., Barnett v. Apfel, 231 F.3d 687, 691 (10th Cir. 2000) (where there was no evidence presented at the hearing about plaintiff's expected absenteeism and the plaintiff's extrapolation on appeal of how many days she would have missed from work was not limited to time missed due to her back impairment, neuropathy, and heart condition and assumes she was required to miss an entire day for each appointment); Morin v. Colvin, No. 4:14-cv-000769-NKL, 2015 WL 4928461, at *9-10 (W.D. Mo. Aug. 18, 2015) (the plaintiff failed

to show the frequency of his healthcare appointments and any disruption they would cause); <u>Menolascina v. Barnhart</u>, 01 C 4935, 2002 WL 731147, at *8  (N.D. Ill. April 24, 2002) (the evidence in the record—such as the plaintiff's ability to maintain his daily and weekly exercise regimens—belied the plaintiff's claim that he would miss two days of work per week because of pain).  Here, evidence in the record supports Plaintiff's contention that he would have numerous absences from work.

The resolution of Plaintiff's other contentions of error—that the ALJ should have considered a closed period of disability;[2] failed to evaluate the opinion of Dr. Edward A. Trudeau, who issued a Consultation Report (R. 429) after conducting nerve conduction studies and a needle electromyographic examination; and erred in evaluating the effects of the migraine headaches—could be affected by the ALJ's proper consideration of Plaintiff's ability to sustain employment.  Therefore, the Court will not address them here.  The

---

[2] A plaintiff may be awarded disability benefits if he demonstrates he was disabled during a discrete 12-month period of time, referred to as a "closed period." <u>See Brown v. Massanari</u>, 167 F. Supp. 2d 1015, 1016 n. 2 (N.D. Ill. 2001); <u>Reed v. Colvin</u>, No. 1:14-CV-080JD, 2015 WL 4921614 (N.D. Ind. Aug. 18, 2015) (noting that claimants are "entitled to disability benefits if they were disabled for any continuous period of at least 12 months"), <u>aff'd</u> 2016 WL 4371511 (7th Cir. Aug. 16, 2016).

Court notes, however, that Dr. Trudeau's opinions in his Consultation Report that (1) it seemed reasonable for Plaintiff to apply for disability and (2) that Plaintiff qualifies for a physical disability are not "medical opinions" and are instead opinions on an issue reserved to the Commissioner.  See 20 C.F.R. § 404.1527(d)(1).  As such, those opinions are not given any special significance.  20 C.F.R. § 404.1527(d)(3); Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002).

## VI. CONCLUSION

For the reasons stated, Plaintiff's Motion for Summary Judgment (d/e 11) is GRANTED and Defendant's Motion for Summary Affirmance (d/e 15) is DENIED.  The Commissioner's final decision denying Michael J. Cooper's applications for Social Security Disability Insurance benefits and Supplemental Security Income Disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment in favor of Plaintiff.  This case is CLOSED.

**ENTER:  November 30, 2016**

**FOR THE COURT:**

<u>     *s/Sue E. Myerscough*  </u>
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**